## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**FILED**

2005 JAN 20  A II: 40

U.S. DISTRICT COURT
BRIDGEPORT, CONN

RAYMOND P. BALDYGA, JR.,                    :
                                            :
    Plaintiff,          :  Civil Action No.
                                            :  3:02 CV 1141 (JCH)
  v.                                :
                                            :
SIKORSKY AIRCRAFT                           :  January 20, 2005
CORPORATION,                                :
                                            :
    Defendant.          :


## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Gary L. Lieber (ct13839) (gll@saslaw.com)
Anessa Abrams (ct16594) (aa@saslaw.com)
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Ave., N.W.
Suite 1000
Washington, D.C.  20037-1922
Phone (202) 333-8800
Fax (202) 625-3301

Edward J. Dempsey (ct05183)
Labor Counsel
United Technologies Corporation
United Technologies Building
Hartford, CT 06101
(860) 728-7858
(860) 728-6551 (fax)

Attorneys for Defendant
Sikorsky Aircraft Corporation

## INTRODUCTION

Defendant Sikorsky Aircraft Corporation ("Sikorsky Aircraft" or "the Company") has moved for summary judgment on plaintiff's complaint, pursuant to Federal Rule of Civil Procedure 56. Sikorsky Aircraft submits this memorandum in support of that motion.

Plaintiff has brought suit under the federal and state age discrimination statutes, contending that he was laid off in May 2001 because of his age. At the time of his layoff, plaintiff was a Labor Grade 2 Working Leader in Department 1530, the Receiving Inspection Department. In such position, plaintiff was a member of the bargaining unit. He was laid off along with other employees in accordance with the seniority provisions of a collective bargaining agreement governing his employment.

## STATEMENT OF FACTS

### A.    Background

Plaintiff Raymond P. Baldyga, Jr. began working at Sikorsky Aircraft on July 11, 1977 as an Inspection Crib Attendant in department 1530, job code 6908,[1] occupational group 69, labor grade 9. Defendant's Local Rule 56(a)1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("Def. SF") ¶ 1. During his entire tenure with the Company, plaintiff was a member of the bargaining unit whose employment was governed by the terms and conditions of a Collective Bargaining Agreement ("CBA") between the Company and Local 1150. Def. SF ¶ 5.

On February 20, 1978, plaintiff was promoted to Inspector Standard Parts, department 1530, job code 5002, occupational group 50, labor grade 8. Def. SF ¶ 7. On April 30, 1979,

---

[1]    The first two numbers of the job code identify the occupational group. Def. SF ¶ 2. The occupational groups are negotiated and agreed upon between the Company and International Brotherhood of Teamsters, Local 1150 ("Local 1150" or "the Union"). Def. SF ¶ 3. Occupational groups are used for layoff and recall purposes only. Def. SF ¶ 4.

plaintiff was promoted to Inspector Machined Parts, department 1530, job code 5001, occupational group 50, labor grade 6.  Def. SF ¶ 8.

On April 18, 1983, plaintiff was promoted to Inspector – Parts and Layout, department 1530, job code 5009, occupational group 50, labor grade 4.  Def. SF ¶ 9.  On June 15, 1987, plaintiff was promoted to Senior Layout Inspector, department 1530, job code 5006, occupational group 50, labor grade 3.  Def. SF ¶ 10.  Employees in Department 1530 (Receiving Inspection) were responsible for inspecting parts that were manufactured offsite by suppliers and transported to Sikorsky Aircraft where they would be inspected by Department 1530 employees before being installed as a component part of the helicopter assembly process.  Def. SF ¶ 11.  The inspections were conducted on an audit basis, with those suppliers who had better quality records having their parts inspected on a less frequent audit schedule.  *Id.*

**B.      Plaintiff's 1993 Promotion to Working Leader – Receiving & Layout Inspection**

The promotional path for employees in occupational group 50 is to move within occupational group 50 from a labor grade 8 to a labor grade 6 to a labor grade 4 to a labor grade 3 position.  Def. SF ¶ 12.  Once an individual reaches the point of being promoted to the labor grade 2 Working Leader – Receiving & Layout Inspection position, the employee crosses over to occupational group 54.  Def.  SF ¶ 12.  As of May 2001, this promotional path had been in existence for approximately 35 years.  Def. SF ¶ 12.[2]

The purpose of crossing over to a different occupational group as the working leader is so that the working leader can effectively work with employees in more than one occupational group.  With respect to the Working Leader – Receiving & Layout Inspection position, job code

---

[2]      There are other instances in the Company where the promotional path for positions crosses over to a different occupational group.  Def. SF ¶ 14.

5420, labor grade 2, this position enabled the working leader to direct and assign work to employees in both occupational group 50 and occupational group 54. Def. SF ¶ 13.

Following his promotional path, on May 3, 1993, plaintiff was promoted to Working Leader – Receiving & Layout Inspection, department 1530, job code 5420, occupational group 54, labor grade 2. Def. SF ¶ 15.

## C.    Plaintiff's 1996 Demotion and 1998 Promotion

In May 1996, due to a downturn in business, the Company needed to reduce the number of employees in occupational group 50 and conducted a layoff within that occupational group. Def. SF ¶ 16. In May 1996, there was no layoff in occupational group 54, Def. SF ¶ 17 – a fact which plaintiff cannot dispute. Def. SF ¶ 18. After the 1996 layoff in occupational group 50 was concluded, the Company determined that there was a need for fewer employees in the position of Working Leader – Receiving & Layout Inspection, job code 5420, labor grade 2, as there were now fewer employees to whom the working leaders directed and assigned work. Def. SF ¶ 19.

Accordingly, based solely on seniority, plaintiff was demoted on May 27, 1996 from his labor grade 2 occupational group 54 working leader position to the position of Senior Layout Inspector, department 1530, occupational group 50, labor grade 3. Def. SF ¶ 20. Plaintiff claims that, as a result of this demotion, he first became aware that the labor grade 2 working leader position which he had held was actually within occupational group 54. Def. SF ¶ 21.

On May 4, 1998, as a result of a grievance, plaintiff was promoted back to the Working Leader – Receiving and Layout Inspection position in occupational group 54, labor grade 2. Def. SF ¶ 22. Again, plaintiff was aware that the labor grade 2 position he was employed in was in

3

occupational group 54. Def. SF ¶ 22. Plaintiff remained in this position until his layoff in May 2001. Def. SF ¶ 23.[3]

**D.     Sikorsky Aircraft's Policy Against Discrimination**

Sikorsky Aircraft has long maintained a policy against discrimination and treats all employees on the basis of their qualifications, without regard to, among other things, age, sex, race, color, religion, national origin or disability. Def. SF ¶ 25. This policy is set forth in the Company's Hourly Employee Manual, which is provided to all hourly employees, and emphasizes that it is Sikorsky Aircraft's policy "to recruit, hire, train and promote employees in all job classifications without regard to race, color, age, religion, sex, handicap, national origin, marital or veteran status." *Id.*

The Company's policy against discrimination is reiterated every year through General Notices. It is the Company's policy that these General Notices are routinely posted on all bulletin boards in all Sikorsky Aircraft facilities. Def. SF ¶ 26.

In addition, Article IV of the CBA between the Company and the Union likewise prohibits discrimination:

> The Company and the Union recognize that employees covered by this agreement may not be discriminated against in violation of the provisions of the Labor Management Relations Act of 1947, as amended, on the basis of membership or nonmembership in the Union, or on the basis of race, color, sex, age, religion, national origin, veteran status, or disability.

Def. SF ¶ 27.

**E.     Background to the May 2001 Reduction in Force and the Layoff Process**

Article I of the CBA, entitled "Management Functions," provides that the Company has the sole right and responsibility to determine the size of the workforce:

---

[3]      In fact, plaintiff worked in department 1530 for his entire career at Sikorsky Aircraft prior to the May 2001 layoff. Def. SF ¶ 24.

> It is recognized that in addition to other functions and responsibilities the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine . . . the size and number of the working force in the active employ of the Company from time to time; . . .

Def. SF ¶ 28.

> The CBA further provides that the Company has the right to lay off employees:

> It shall also have the right and responsibility to promote, demote and transfer employees, and to discharge, suspend, or otherwise progressively discipline any employee for just cause, and to lay off because of lack of work or other cause, unless otherwise hereinafter provided.

Def. SF ¶ 29.

In January 1993, there were 5914 bargaining unit employees in the Company's Connecticut and West Palm Beach facilities. Def. SF ¶ 30.[4] In January 1999, there were 4078 bargaining unit employees in the Connecticut and West Palm Beach facilities. Def. SF ¶ 31. As a result of a continued downturn in its government and commercial business, Sikorsky Aircraft continued to repeatedly downsize its workforce and both hourly and salaried workforce reduction programs were implemented. Def. SF ¶ 33. In early 1999, in accordance with the CBA, the Company implemented a voluntary early retirement program and provided hourly employees age 55 and over with 25 or more years of credited service with the option to voluntarily participate in the program and leave the Company. Def. SF ¶ 34. Employees who chose to participate in the Voluntary Early Retirement Program received monetary benefits, as set forth in Letter 26 of the CBA. Def. SF ¶ 35. During 1999-2000, approximately 475 hourly employees voluntarily left the Company under this program. Def. SF ¶ 36.

---

[4]     More than 90% of the bargaining unit employees are located in Connecticut. Def. SF ¶ 32.

5

In 2001, the Company continued to evaluate its business conditions. Def. SF ¶ 37.

During 2001, when department headcounts were required to be reduced, the Company, in some

cases, reassigned supervisors back to hourly positions within the bargaining unit. Def. SF ¶ 38.

In addition, during 2001, the Company closed a satellite facility and consolidated some

manufacturing operations in order to become more efficient and reduce costs. Def. SF ¶ 39.

Moreover, involuntary hourly workforce reductions were implemented due to a decrease

in the Company's volume of work and a requirement to reduce cost to enhance the Company's

worldwide competitiveness. Def. SF ¶ 40.  All hourly involuntary workforce reductions are

carried out in accordance with the terms of the CBA. *Id.*

Pursuant to the terms of the CBA, hourly employees subject to layoff are chosen by

reverse seniority within non-interchangeable occupational groups. Def. SF ¶ 41.  Specifically,

the CBA provides:

> In case of indefinite layoff for lack of work, employees shall be laid off and
> recalled by non interchangeable occupational groups in accordance with their
> seniority (length of continuous service with the Company since the most recent
> date of hire).

Def. SF ¶ 41.  When layoffs in the hourly workforce are necessary, the CBA further provides the

procedure to be applied:

> Whenever layoffs are necessary to reduce the working force in any job
> classification, the following procedure shall be applied:
>
> (a)     Probationary employees, if any, who are classified in the affected
>         occupational group in labor grades the same as or lower than the job
>         classification which requires reduction, shall first be laid off in whatever
>         numbers are necessary, provided there remain other employees with
>         seniority who are qualified and willing to perform the remaining work.
>
> (b)     Thereafter, employees with seniority classified in the affected job
>         classification in the particular occupational group, but whose seniority is
>         insufficient to entitle them to remain in their job classification shall be

6

transferred, reclassified in a job in a lower labor grade, or laid off in accordance with the following:

(1)    An employee with seniority who is excess as a result of reduction in force in his/her job classification (or an employee who is displaced by a senior employee, as provided below) will displace an employee of lesser seniority in the following order:

    (a)    The least senior employee in a job classification of the same labor grade in the particular occupational group.

    (b)    The least senior employee in the next and succeeding lower labor grades until the lowest labor grade in the particular occupational group is reached.

(2)    An employee whose seniority is insufficient to displace any other employee in any other job classification of the same or lower labor grade in the same occupational group shall be laid off, provided there remain other employees with more seniority who are qualified to perform the remaining work.

Def. SF ¶ 42.

The CBA further provides that certain job classifications are exempt from layoff since the employees in those positions possess critical skills:

This is to confirm the understanding and agreement reached at recent contract negotiations between Sikorsky Aircraft Corporation and the Sikorsky Teamsters Local No. 1150 of the International Brotherhood of Teamsters concerning the potential exclusion from layoff of employees with critical skills.

The parties agree there exist certain job classifications deemed critical to the operation of the business, and thus necessary for the company to retain employees in these job classifications during periods of layoff. In the event of a layoff and the need for retention of critical skills, Article VIII language will apply for those job classifications listed below.

- All VH Job Classifications
- Autoclave Operator
- Senior Composite Worker – Fabric Cutter
- Composites Repairer
- Composites Inspector with Ultrasonic Test Certification
- Inspector/Programmer
- All DMIR, DAR, ODAR Job Classifications
- All Gear Machining and Gear Grinder Job Classifications

\*          \*          \*

Other than such cases where critical skills apply, seniority will be the guiding
factor within the Occupational Group.

\*          \*          \*

Def. SF ¶ 43.[5]

**F.     The May 2001 Reduction in Force and Plaintiff's Selection for Layoff**

In the Spring of 2001, prior to the May 2001 layoff, several managers within the Product

Integrity Department – Jim Miranti (Vice President, Product Integrity), James Nastri (Director,

Product Integrity), John DePuma (Co-Captain, Product Integrity), and Mark Lindsey (Leader,

Supplier Quality) – met on numerous occasions to determine the future course of how Sikorsky

Aircraft would inspect supplier manufactured parts. Def. SF ¶ 46. At these meetings, based on

the managers' recommendation, Jim Miranti decided to make a fundamental change in the

inspection process for supplier manufactured parts, concluding that the general practice of

---

[5]     The Company had long considered certain jobs "critical" and in 1996, the Company and
the Union memorialized the list deemed critical in Letter 18 of the CBA. Def. SF ¶ 44. Because
employees in occupational groups frequently exist in more than one department, it was essential
that this critical skills protection exist. *Id.* For example, the "VH" jobs referenced above include
all Presidential helicopter positions. Such jobs require security clearances that regularly take a
year or more to obtain. *Id.* The Company was thus required, as a matter of business exigency, to
protect employees in those jobs – regardless of their seniority – so as to guarantee there will be a
sufficient number of employees performing work on the Presidential fleet of helicopters even if
there were a significant layoff affecting occupational groups that occupy the VH/Presidential
department as well as other departments. *Id.* Stated otherwise, but for Letter 18, because
employees are laid off in reverse seniority order within an occupational group scheduled for
layoff, junior employees working within the VH Department would be subject to layoff, leaving
the Company with a manpower shortage in an important project which cannot be backfilled by
the transfer of more senior employees in the same occupational group because such employees
lack the security clearance to work on the VH/Presidential fleet. *Id.* Many of the other jobs on
the Letter 18 list deal with jobs within occupational groups that require specialized knowledge
obtained on the job. But for Letter 18, more senior employees in the same occupational group
would backfill into those jobs when layoffs occur in that particular occupational group but they
would lack the skills and experience to perform those important jobs. Def. SF ¶ 45.

inspecting supplier parts at Sikorsky Aircraft was not the most economic and efficient manner of performing these inspections. Def. SF ¶ 47. Instead, it made more sense to shift these inspections to the source of manufacturing, as this would enable Sikorsky Aircraft to resolve problems quickly and have the supplier inspectors resolve issues on the spot and enable point of use shipment of material. Def. SF ¶ 47. In contrast, under the then current practice of conducting inspections at Sikorsky Aircraft, if there was a problem with a part, the Company would frequently have delays in communicating with the supplier and would regularly have to return parts to the suppliers' place of business. It could take 60 days or more to get the material corrected and returned. *Id.* The Company further determined that moving inspections to the source would result in a substantial financial savings to Sikorsky Aircraft in excess of $350,000 for one year. Def. SF ¶ 48.

In light of this business decision to move the vast number of inspections to the source of manufacturing, there would be a substantial reduction in the amount of work performed in Department 1530. Def. SF ¶ 49. Based on this business decision, the Company determined that Department 1530 needed to immediately reduce its headcount by nine employees, reducing the number of employees in the department from 25 to 16. Def. SF ¶ 50. The Company determined that five of the employees would be from occupational group 50 and four of the employees impacted would be from occupational group 54. Def. SF ¶ 50. All of the working leaders in Department 1530 were in occupational group 54. Def. SF ¶ 51. The Company decided that, going forward, it would only need two Department 1530 working leaders, one for the first shift and one for the second shift. Since there were five working leaders in Department 1530, that would require the elimination of three of the five working leader positions. Def. SF ¶ 52. The Company further determined that within occupational group 54 the position of Receiving

Inspector Bulk Items would no longer be required as, given the overall reduction in workload, the inspection work performed by this position could be absorbed by a more senior occupational group 50 inspector within Department 1530. Def. SF ¶ 53.

Upon review of the seniority list for occupational group 54 and pursuant to the express terms of the CBA, the Company determined that the three most junior employees by seniority in occupational group 54 – Mary Poleio, Renaldo Garcia and Daniel Hespelt – were protected from layoff pursuant to Letter 18 of the CBA because they were employed in critically skilled positions. Def. SF ¶ 54. The next two most junior employees in terms of seniority – Paul Wojcicki and William Lucas – were not employed in critically skilled positions, and therefore were subject to layoff. Def. SF ¶ 55. Working up the seniority list, the next most junior employee by seniority – Gertrude Mcmillian – was employed in a critically skilled position and was, therefore, exempt from layoff pursuant to the CBA. Def. SF ¶ 56. The remainder of the employees in occupational group 54 in reverse seniority order were: Reba Gomes, plaintiff, Bruce Redmann, Joseph Lesko, and Adrian Stanley. Def. SF ¶ 57. None of these individuals was employed in a critically skilled position. Def. SF ¶ 57. As plaintiff was not critically skilled, Def. SF ¶ 58, he was not protected from layoff under the CBA. Def. SF ¶ 59.

Accordingly, the four most junior employees in occupational group 54 who were not exempt from layoff pursuant to Letter 18 of the CBA because of critical skills were: Paul Wojcicki, William Lucas, Reba Gomes and plaintiff. Def. SF ¶ 60. These four employees were slated to be laid off from occupational group 54 effective May 4, 2001. Def. SF ¶ 60. If the Company had demoted plaintiff back to the labor grade 3 position in occupational group 50 in May 2001 instead of laying off plaintiff, the Company would have violated Section 8.11 of the CBA between the Company and the Union, as both occupational group 50 and 54 were impacted

10

by layoffs in 2001, Def. SF ¶ 61 – a fact which plaintiff cannot dispute, Def. SF ¶ 61, and which distinguished this situation from plaintiff's demotion in 1996.[6]

As employees in occupational group 54 with high seniority were scheduled to be laid off, in April 2001, prior to the layoff, the Company's Manager of Human Resources, Thaddeus Garbien, asked Jeffrey Cederbaum, then Secretary/Treasurer of Local 1150, if the Union wanted to give the Company a waiver for any breach of the CBA so that the Company could transfer plaintiff and Mr. Lucas back to a labor grade 3 position in occupational group 50 instead of laying off plaintiff and Mr. Lucas. Def. SF ¶ 63. Mr. Cederbaum refused to give the Company a waiver to place plaintiff and Mr. Lucas back into occupational group 50. Mr. Cederbaum informed Mr. Garbien that the Company should lay off employees in both occupational group 50 and 54 in seniority order. Def. SF ¶ 64.

Accordingly, Paul Wojcicki, William Lucas, Reba Gomes and plaintiff were laid off from occupational group 54 effective May 4, 2001.[7] Def. SF ¶ 65. As plaintiff admits, all employees junior to plaintiff in terms of seniority who remained employed in occupational group 54 were exempt from layoff pursuant to Letter 18 of the CBA. There was no employee junior to plaintiff who was not critically skilled who was not selected for layoff from occupational group 54. Def. SF ¶ 66. Plaintiff could not bump down to a lower labor grade within occupational group 54 since all of the employees junior to plaintiff in occupational group 54 were "critically skilled" and protected from any layoff, pursuant to Letter 18 of the CBA, regardless of their seniority.

---

[6]     Section 8.11 was inserted into the CBA at the Union's behest so as to prevent the Company from moving a favored employee out of his or her occupational group and into another occupational group just prior to a layoff in the employee's original occupational group. Def. SF ¶ 62. Thus, the provision states that the employee maintains seniority in the original occupational group for 60 days after being transferred to a different occupational group. *Id.*

[7]     Plaintiff was rehired by the Company as a Kit Assembler, job code 7023, labor grade 8, on November 19, 2001 and has subsequently been promoted. Def. SF ¶ 101.

Def. SF ¶ 67. There was no junior employee in occupational group 54 that plaintiff could displace. *Id.*

Plaintiff's age played absolutely no part in his selection for layoff. Def. SF ¶ 69. Plaintiff was selected for layoff based solely upon seniority within occupational group 54, pursuant to the express terms of the CBA. There was absolutely no other reason for plaintiff's selection for layoff. Def. SF ¶ 73.

The plaintiff was born in 1955. Def. SF ¶ 75. Accordingly, at the time of the May 2001 layoff, plaintiff was 45 years old. In the May 2001 layoff, Sikorsky Aircraft retained employees in occupational group 54 who were the following ages at the time of the layoff: 55, 58, 50, 49, 34, 51 and 43. Def. SF ¶ 76. Indeed, plaintiff admits that Sikorsky Aircraft retained employees in occupational group 54 who were both older than plaintiff and over the age of 40. Def. SF ¶ 79. In the May 2001 layoff, it is undisputed that the Company laid off employees younger than plaintiff. Def. SF ¶ 80. Indeed, in the May 2001 layoff, the Company laid off employees under the age of 40 – a fact which plaintiff cannot dispute. Def. SF ¶ 81. The two incumbents who remained in the same position plaintiff held at the time he was laid off (occupational group 54, job code 5420, labor grade 2) were 49 and 51 years old at the time of the layoff. Def. SF ¶ 82. Prior to the layoff, the average age of the employees in occupational group 54 was 48.09; after the layoff, the average age of the employees in occupational group 54 increased to 48.57. Def. SF ¶ 83.

A total of 24 employees were involuntarily laid off in May 2001. Def. SF ¶ 85.[8] As a result of the May 2001 layoff, the number of bargaining unit positions in Department 1530

---

[8]    A total of 26 employees were actually laid off in May 2001, but two of the employees – David Garcia and Charles Vives – took a voluntary layoff. Def. SF ¶ 86.

(Receiving Inspection) decreased from 25 to 16. Def. SF ¶ 87. As the Company continues to make process improvements, it has continued to reduce the size of Department 1530. Def. SF ¶ 88. Department 1530 currently has only 12 bargaining unit employees. Def. SF ¶ 89. By the time the training of outside suppliers is completed in 2005, it is planned that there will be approximately five employees in Department 1530. Def. SF ¶ 90. After the May 2001 layoff, there were 3397 bargaining unit employees in the Company's Connecticut and West Palm Beach facilities. Def. SF ¶ 91.

## PROCEDURAL HISTORY

On May 2, 2001, plaintiff filed a grievance concerning his layoff, alleging that he was "miss classified in [occupational] group 54." Def. SF ¶ 94.[9]

On or about September 20, 2001, plaintiff filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging that he was terminated and retaliated against because of his age. Def. SF ¶ 95. On February 11, 2002, the CHRO dismissed plaintiff's charge concluding, among other things, that plaintiff was "not discharged due to [his] age, 45 years old" and that "the record indicates that [plaintiff] was discharged due to a reduction in force brought about by changes in respondent's business." Def. SF ¶ 96.

On March 3, 2002, the CHRO issued plaintiff a Release of Jurisdiction. Def. SF ¶ 97. Plaintiff received the Release of Jurisdiction from the CHRO on March 6, 2002. Def. SF ¶ 98.

---

[9]    In accordance with the Stipulation of Dismissal in *Sikorsky Aircraft Corporation v. Teamsters Local 1150, affiliated with the International Brotherhood of Teamsters*, Civil Action No. 3:03 CV 0861 (JCH) (D. Conn.), which was "SO ORDERED" by this Court on October 12, 2004, the April 15, 2003 Opinion and Award of Arbitrator Michael Walsh, Case No. SIK 02-1, regarding Mr. Baldyga's grievance is "void and has no effect and may not be cited in any proceedings."

The Equal Employment Opportunity Commission issued plaintiff a Dismissal and Notice of Rights on April 24, 2002. Def. SF ¶ 99.

On July 2, 2002, plaintiff filed his complaint in this matter, alleging that the Company discriminated against him because of his age by laying him off in May 2001, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-58 *et seq.* ("CFEPA"). Def. SF ¶ 100.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant can satisfy its burden by pointing to an absence of evidence in support of the non-moving party's case. *Walker v. Access Agency*, 2004 U.S. Dist. LEXIS 19624, at *8 (D. Conn. Aug. 31, 2004) (copy attached) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir. 1999)).

Once the movant satisfies this burden, the party opposing the motion must "'set forth specific facts showing that there is a genuine issue for trial.'" *Lyon v. Jones*, 260 F. Supp. 2d 507, 510-11 (D. Conn. 2003), *aff'd*, 2004 U.S. App. LEXIS 5911 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "'The mere existence of *some* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Id.* at 511 (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original). The party opposing summary judgment may not rest upon the allegations or denials contained in the pleadings. *Choate v. Transport Logistics Corp.*, 234 F. Supp. 2d 125, 128 (D. Conn. 2002).

14

In the context of a discrimination case, the non-moving party "must submit evidence that shows or creates a triable issue of fact as to whether discrimination was the real reason for [defendant's] employment action." *Walker*, 2004 U.S. Dist. LEXIS 19624, at *15 (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 382 (2d Cir. 2001)). As this district has previously stated, "the Second Circuit has recently and repeatedly affirmed grants of summary judgment in ADEA discharge cases in favor of the employer on the grounds that the record evidence was insufficient for a jury to find that the real reason behind the employee's termination was age." *Choate*, 234 F. Supp. 2d at 128 (collecting cases). Indeed, an employer is entitled to summary judgment "'if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Choate*, 234 F. Supp. 2d at 130 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

## ARGUMENT

I. **SUMMARY JUDGMENT MUST BE GRANTED ON PLAINTIFF'S AGE DISCRIMINATION CLAIMS, AS HE CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATION AND HE HAS NO EVIDENCE THAT THE COMPANY'S LEGITIMATE NON-DISCRIMINATORY REASON IS A PRETEXT FOR AGE DISCRIMINATION.**

Plaintiff alleges that Sikorsky Aircraft discriminated against him because of his age by laying him off, in violation of the ADEA and CFEPA. Summary judgment must be granted on plaintiff's claims, as plaintiff cannot establish a *prima facie* case of discrimination and plaintiff has no evidence of pretext.

Discrimination claims under the ADEA are analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Roge v.*

*NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (citing *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000)).[10]  Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  *See Roge*, 257 F.3d at 168.  If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a non-discriminatory reason for its actions.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Roge*, 257 F.3d at 168 (citing *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

Once the employer articulates a non-discriminatory reason, the presumption of discrimination drops out of the case.  *Roge*, 257 F.3d at 168 (citing *Tarshis*, 211 F.3d at 36); *James*, 233 F.3d at 154, 156.  The burden then shifts back to the plaintiff to prove "'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Roge*, 257 F.3d at 168 (quoting *Reeves*, 530 U.S. at 143); *see also Roge*, 257 F.3d at 169 ("Roge had the burden to 'present evidence from which a factfinder could reasonably conclude that the [employer's] reason was pretextual and that the real reason was discrimination.'") (citation omitted).  The ultimate burden of proving intentional discrimination remains at all times with the plaintiff.  *Reeves*, 530 U.S. at 143; *James*, 233 F.3d at 154.

### A.      Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discrimination, plaintiff must demonstrate that:  (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  *Roge*, 257 F.3d at 168.  Sikorsky Aircraft does not

---

[10]      Claims of age discrimination under the CFEPA are adjudicated using the same standards for claims brought under the ADEA.  *Pascal v. Storage Tech. Corp.*, 152 F. Supp. 2d 191, 196 n.1 (D. Conn. 2001).  Accordingly, this argument applies equally to plaintiff's ADEA and CFEPA claims.

dispute, for purposes of this motion, that plaintiff can satisfy the first three elements of the *prima facie* case. Plaintiff, however, cannot demonstrate that his layoff occurred under circumstances giving rise to an inference of age discrimination, and summary judgment must therefore be granted.

Plaintiff was laid off as part of an involuntary workforce reduction which impacted twenty-four employees. Def. SF ¶¶ 65, 85. The layoff was conducted based strictly on seniority within occupational groups, pursuant to the express terms of the CBA – a fact which plaintiff admits. Def. SF ¶ 74. Although the CBA protects certain positions from layoff, Def. SF ¶ 43, plaintiff was not employed in a critically skilled position, Def. SF ¶ 58, and, therefore, plaintiff was not protected from layoff pursuant to the terms of the CBA. Def. SF ¶ 59.

Plaintiff was selected for layoff because, upon review of the seniority list for occupational group 54, the Company determined that plaintiff was one of the four most junior employees in terms of seniority within occupational group 54 who was not protected from layoff pursuant to Letter 18. Def. SF ¶ 60. Plaintiff has no evidence to dispute these facts. Indeed, as plaintiff admits, there was no employee in occupational group 54 who was junior to plaintiff in terms of seniority and who was not critically skilled pursuant to the CBA who was not laid off. All employees junior to plaintiff in occupational group 54 who were not laid off were critically skilled and exempt from layoff pursuant to Letter 18 of the CBA. Def. SF ¶ 66. Plaintiff's age played absolutely no part in his selection for layoff. Def. SF ¶ 69. Indeed, plaintiff's manager at the time of the layoff did not even know plaintiff's age. Def. SF ¶ 70. Moreover, the age of any employee was not discussed during meetings regarding the Company's change in business plan nor was age discussed as being a factor in the Company's business decisions. Def. SF ¶ 71. No one told plaintiff that he was laid off because of his age. Def. SF ¶ 72.

17

Out of the seven employees who were retained in occupational group 54 after the layoff, all but one was over the age of 40. *See* Def. SF ¶ 76. Indeed, three out of the four employees in occupational group 54 who were critically skilled and protected from layoff were over the age of 40. Def. SF ¶ 77. In fact, plaintiff admits that Sikorsky Aircraft retained employees both older than plaintiff and over the age of 40 in occupational group 54. Def. SF ¶ 79. Indeed, the two employees employed in the position plaintiff held at the time of the layoff who were retained by the Company were 49 and 51 years old in May 2001. Def. SF ¶ 82. Moreover, plaintiff cannot dispute that the average age of employees in occupational group 54 increased from 48.09 years before the layoff to 48.57 years after the layoff. Def. SF ¶ 83. This average age is three and one-half years greater than plaintiff's age at the time of the layoff. *See* Def. SF ¶ 84.

As plaintiff further admits, the Company laid off employees in the May 2001 layoff who were younger than plaintiff. Def. SF ¶ 80. In fact, the Company laid off employees under the age of 40 – a fact which plaintiff cannot dispute. Def. SF ¶ 81.

Moreover, since the May 2001 layoff, the number of bargaining unit employees in Department 1530 has continued to decrease. As a result of the May 2001 layoff, 16 employees remained in Department 1530. Def. SF ¶ 87. However, Department 1530 currently has only 12 bargaining unit positions. Def. SF ¶ 89. Indeed, by the time the training of suppliers is completed in 2005, it is planned that there will be approximately five employees in Department 1530. Def. SF ¶ 90.

Accordingly, plaintiff cannot demonstrate that he was laid off under circumstances giving rise to an inference of age discrimination. There is not a scintilla of evidence supporting a *prima facie* case of age discrimination. It is clear plaintiff brought this case as an age discrimination complaint because he happened to fit into that protected class and none other. If he fit into

another protected class and not age, he likely would have filed on a different legal theory based on membership in a different protected class.  Plaintiff was a competent employee who was laid off not because of his qualifications or age but, rather, because his occupational group was relatively small in number and contained several employees junior to him in seniority but who, nevertheless, were critically skilled protected and, therefore, as a function of an agreement with the Union which was made part of the CBA, not subject to layoff.  When confronted with the economic need to reduce manpower in occupational group 54 – a fact which plaintiff cannot legitimately dispute – plaintiff's position on the seniority list within his occupational group was reached and he was, therefore, laid off.  Summary judgment must be granted on plaintiff's age discrimination claims.  *See, e.g., Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 251-52 (1st Cir. 2000) (ADA case) (plaintiff failed to demonstrate a *prima facie* case where, among other things, reduction in force was implemented blindly based solely on seniority and no individual with less seniority than plaintiff was retained); *Millane v. Becton Dickinson & Co.*, 84 F. Supp. 2d 282, 287 (D. Conn. 1999) (plaintiff failed to establish a *prima facie* case of age discrimination where, among other things, the Company laid off employees under the age of 40 at the time it laid off plaintiff and where plaintiff's duties were taken over by an older employee); *Pisana v. Merrill Lynch & Co.*, 1995 U.S. Dist. LEXIS 10296, at *13-14 (S.D.N.Y. July 20, 1995) (copy attached) ("Furthermore, several of the retained individuals were older than Pisana. . . . This fact alone strongly suggests that the RIF was not pretextual for age discrimination.") (citing *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 118 (2d Cir. 1991), and *Parcinski v. Outlet Co.*, 673 F.2d 34, 36 (2d Cir. 1982), *cert. denied,* 459 U.S. 1103 (1983)).

19

**B.    Sikorsky Aircraft Has Articulated a Legitimate Non-Discriminatory Reason for Plaintiff's Layoff, and Plaintiff Has No Evidence of Pretext**

Assuming *arguendo* for purposes of this motion only that plaintiff can demonstrate a *prima facie* case of discrimination, summary judgment is nevertheless appropriate as the Company can articulate a non-discriminatory reason for plaintiff's layoff and plaintiff has no evidence of pretext.

For a number of years, the Company repeatedly downsized its workforce due to the downturn in its government and commercial business, and conducted both hourly and salaried workforce reductions.  Def. SF ¶ 33.  During 1999-2000, approximately 475 hourly employees voluntarily left the Company pursuant to a voluntary early retirement program implemented in 1999 in accordance with the CBA.  Def. SF ¶¶ 34, 36.

Prior to the May 2001 layoff, the Company decided to make a fundamental change in the inspection process for supplier manufactured parts, concluding that the general practice of inspecting supplier manufactured parts at Sikorsky Aircraft was not the most economic and efficient manner of performing these inspections.  Def. SF ¶¶ 46-47.  Accordingly, the Company decided to shift the inspections to the source of manufacturing, as this would enable the Company to resolve problems quickly and have the suppliers resolve issues on the spot and enable point of use shipment of materials, thereby resulting in a substantial financial savings to Sikorsky Aircraft in excess of $350,000 for one year.  Def. SF ¶¶ 47-48.  In light of this business decision, there would be a substantial reduction in the amount of work performed in Department 1530, and therefore, the Company determined that Department 1530 needed to immediately reduce its headcount by nine employees, with five of the employees coming from occupational group 50 and four of the employees coming from occupational group 54.  Def. SF ¶¶ 49-50.  The Company further determined that with fewer employees in Department 1530, it would no longer

need five working leaders in Department 1530. Rather it would only need two Department 1530 working leaders, one for the first shift and one for the second shift. Def. SF ¶ 52. It further determined that the position of Receiving Inspector Bulk Items would no longer be required. Def. SF ¶ 53. A total of 24 employees from numerous departments and occupational groups were involuntarily laid off in May 2001. Def. SF ¶ 85.

As previously set forth, hourly employees subject to layoff are chosen by reverse seniority within non-interchangeable occupational groups, in accordance with the express terms of the CBA, and employees in certain positions are exempt from layoff pursuant to Letter 18 of the CBA. Def. SF ¶¶ 40-44. Following the procedures set forth in the CBA, the Company determined which employees were the four most junior employees in terms of seniority in occupational group 54 who were not exempt from layoff pursuant to Letter 18 of the CBA. *See* Def. SF ¶¶ 54-60. Based solely on seniority in accordance with the CBA, plaintiff was laid off as one of the four most junior, non-critically skilled employees in occupational group 54. Def. SF ¶¶ 60, 65-66, 73-74. Plaintiff was selected for layoff based solely on seniority within occupational group 54 pursuant to the express terms of the CBA. Def. SF ¶ 73.

As plaintiff was laid off as part of a reduction in force based on non-discriminatory selection criteria, the Company has satisfied its burden by articulating a non-discriminatory reason for plaintiff's discharge. *See, e.g., Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (defendant presented evidence that discharge was part of a business-justified company-wide reduction in force and that plaintiff's selection was based upon neutral factors unrelated to age); *Parcinski*, 673 F.2d at 36 (The ADEA "does not forbid essential corporate belt-tightening having no discriminatory motivation.") (citation omitted); *Tarshis v. The Riese Org.*, 195 F. Supp. 2d 518, 525 (S.D.N.Y. 2002), *aff'd*, 2003 U.S. App. LEXIS 5989 (2d Cir. 2003) ("As the

21

Second Circuit has noted in this very case, 'we recognize that a reduction-in-force or restructuring that results in an elimination of jobs often is a legitimate reason for dismissing an employee.'") (quoting *Tarshis*, 211 F.3d at 37 (citing *Woroski*, 31 F.3d at 109, *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994) and *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)); *see also Marcano-Rivera*, 232 F.3d at 252 (defendant articulated legitimate non-discriminatory reason where determination of who to lay off "was a mathematical and blind determination which did not take into consideration any criteria other than seniority" and within plaintiff's job classification and geographic area no employee with less seniority than plaintiff remained employed after the layoff).

As Sikorsky Aircraft articulated a non-discriminatory reason for plaintiff's layoff, plaintiff bears the burden of proving that Sikorsky Aircraft's reason is a pretext for age discrimination. Plaintiff cannot satisfy his burden.

As set forth above, plaintiff was laid off based upon seniority pursuant to the express terms of the CBA. The CBA applies company-wide to bargaining unit employees of all ages. Def. SF ¶ 6. Plaintiff has no evidence that the use of a collectively bargained seniority system for the purpose of conducting layoffs is a pretext for age discrimination. In *Davis v. Con-Way Transportation Central Express, Inc.*, 368 F.3d 776 (7th Cir. 2004), a Title VII race discrimination case, in an attempt to demonstrate pretext, the plaintiff, among other things, attacked the methodology of his selection for layoff, arguing that he should have been insulated from layoff because of his seniority. Rejecting this argument, the Seventh Circuit stated:

> The undisputed evidence, which Davis stubbornly ignores and wholly fails to rebut, is that seniority was observed within *job categories*, not across facilities as a whole. Therefore, when selecting individuals for economic termination, management would determine the number of positions within a job category that

22

needed to be cut, then determine who those people would be based on their seniority – in other words, 'last in first out.' Unfortunately for Davis, he was in a job category that contained only one person – him. Although he may have been more senior than others at the South Bend service center, he was senior to no one within his job category.

*Id.* at 785 (emphasis in original).

Seniority systems are expressly permitted by the ADEA and CFEPA. 29 U.S.C. § 623(f)(2)(A); Conn. Gen. Stat. § 46a-60(b)(1)(E). Indeed, the United States Supreme Court in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), expressly rejected the concept of seniority as a proxy for age. In *Hazen Paper*, the Court addressed the line of cases questioning "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." 507 U.S. at 608. The Court emphatically rejected the possibility of liability for age discrimination based solely upon the conflation of the two concepts:

> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. . . . On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, *see* 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'

507 U.S. at 611 (citation omitted).

As set forth above, plaintiff admits that the Company retained employees in occupational group 54 over the age of 40. Def. SF ¶ 79. Indeed, all the employees who were retained in occupational group 54 because they had more seniority than plaintiff – including those

23

employees in plaintiff's same job code – were over the age of 40, and three out of the four

employees who were protected from layoff pursuant to Letter 18 were over the age of 40.  Def.

SF ¶¶ 77-78, 82.  Indeed, plaintiff cannot dispute that the average age of the employees in

occupational group 54 increased after the layoff and was greater than plaintiff's age.  *See* Def. SF

¶¶ 83-84.  Moreover, the number of employees in Department 1530 has continued to decrease.

Def. SF ¶¶ 87-90.  Accordingly, plaintiff has no evidence that his layoff was a pretext for age

discrimination.  *See, e.g., Roge*, 257 F.3d at 170 & n.2 (plaintiff failed to offer evidence that

defendant's reason was a pretext for age discrimination where plaintiff was not replaced and "his

duties were automated in part and distributed in part among five employees," four of whom were

40 years of age or older and one who was in his thirties); *Woroski*, 31 F.3d at 109 (affirming

summary judgment where, among other things, average age increased after layoff, plaintiffs were

not replaced, and remaining employees were over the age of 40).

　　　While plaintiff speculates that the Company conducts layoffs in certain occupational

groups because of the ages of the employees, Baldyga Dep. at 91-92, speculation is not sufficient

to defeat summary judgment.[11]  *Harlan Assocs. v. The Incorporated Village of Mineola*, 273

F.3d 494, 499 (2d Cir. 2001) ("mere speculation and conjecture is insufficient to preclude the

granting of the motion" for summary judgment); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243

F.3d 93, 101 (2d Cir. 2001) (the "non-moving party may not rely on conclusory allegations or

unsubstantiated speculation") (citation omitted); *Bayway Refining Co. v. Oxygenated Mktg. &*

*Trading A.G.*, 215 F.3d 219, 224 (2d Cir. 2000) ("Conclusory statements, conjecture, or

speculation by the party resisting the motion will not defeat summary judgment.") (citation

---

[11]　　　Indeed, as noted previously, since the average age of the occupational group increased, or
at least stayed basically the same, there is no basis even to speculate that this was one
occupational group that contained older workers that the Company wanted to eliminate or at least
drastically reduce so as to eliminate older workers.

24

omitted). Indeed, plaintiff admits that he has no personal knowledge as to why the Company

would have to conduct layoffs in certain areas, other than because of lack of work. Def. SF ¶ 92.

Thus, plaintiff has no evidence that he was laid off as a pretext for age discrimination. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (moving party satisfies its burden by "pointing out"

the absence of evidence to support the non-movant's claims). The Court cannot second guess the

Company's business decision to conduct a layoff or plaintiff's selection for layoff. *See, e.g.,*

*Parcinski*, 673 F.2d at 37 ("The Age Discrimination in Employment Act does not authorize the

courts to judge the wisdom of a corporation's business decisions.") (citations omitted); *Van Dine*

*v. Robert Bosch Corp.*, 62 F. Supp. 2d 644, 647 (D. Conn. 1999), *aff'd*, 216 F.3d 1074 (2d Cir.

2000) ("The court will not evaluate business decisions or question a corporation's means to

achieve a legitimate goal.") (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1115 (2d

Cir. 1988)). As one district court stated:

> Absent a legally cognizable civil rights violation, the running of the affairs of a
> business entity is for management, not for disappointed employees or their
> counsel. A simple disagreement over what constitutes good management is not a
> fair fight; management will always win. Moreover, it is not available to this
> Court to substitute its ideas of how to run a business for those of the managers
> duly vested with that responsibility, except where the basis for a management
> decision is shown to be an unlawful one.

*O'Sullivan v. The New York Times*, 37 F. Supp. 2d 307, 309 (S.D.N.Y. 1999).

Plaintiff's allegation that the Company "manipulated the process" thereby resulting in his

layoff, Compl. ¶ 9; Baldyga Dep. at 30-31, 39-44, is not sufficient to satisfy plaintiff's burden.

Plaintiff admits that he does not have any evidence that the Company manipulated the process as

alleged in his complaint. Def. SF ¶ 93. Mere conclusory allegations are not sufficient to defeat

summary judgment. *Byrnie*, 243 F.3d at 101; *Bayway Refining Co.*, 215 F.3d at 224.

Accordingly, plaintiff's belief that he was in the wrong occupational group does not satisfy

25

plaintiff's burden of proving pretext. *See, e.g., Marcano-Rivera*, 232 F.3d at 252-53 (allegation of an error in job classification is insufficient, without more, to demonstrate pretext and there is no evidence that even if plaintiff was erroneously classified, that the classification was a pretext for discrimination). In this respect, plaintiff's real complaint has nothing to do with age; rather, he believes he should have never been in occupational group 54. For this issue, his complaint is with the Union who negotiated the occupational group classification as part of the collective bargaining process. Consistent with its right to negotiate occupational groups, the Union could have sought to make the working leader in Department 1530 an occupational group 50 position but it never did. Indeed, at the time of plaintiff's layoff, the Working Leader position in Department 1530 (job code 5420, labor grade 2) had been in occupational group 54 for *35 years*. Def. SF ¶ 12.[12]

Any attempt by plaintiff to demonstrate pretext based on the fact that plaintiff was demoted as a result of the 1996 layoff but laid off in 2001, Baldyga Dep. at 69, is likewise without merit. In 1996, as plaintiff admits, the Company conducted a layoff in occupational group 50. Def. SF ¶ 16. The Company, however, did not conduct a layoff in occupational group 54 in 1996, Def. SF ¶ 17 – a fact which plaintiff cannot dispute. Def. SF ¶ 18. Contrary to 1996, in May 2001, the Company conducted layoffs in both occupational group 50 and occupational

---

[12]    The Company designed a labor grade 2 Working Leader position in Department 1580 in 1999. Department 1580 is fundamentally different than Department 1530. Department 1580 involves the inspection of internally produced machined parts. In addition to the fact that the parts being inspected are frequently of a different nature, the Department 1580 inspections all involve a full 100% inspection and not just an audit-based inspection. Thus, as set forth in the two job descriptions, the Department 1580, labor grade 2, occupational group 50 (job code 5019-2) Working Leader position commenced in 1999 is a completely different job than the Department 1530, occupational group 54 job held by plaintiff. Neither the Union nor plaintiff ever complained or grieved that the job (5420-2 Working Leader Inspection) was too narrow or that it should have been combined with the Working Leader that was exclusively located in Department 1580, Machine Shop Inspection, where plaintiff has *never* worked. Def. SF ¶ 102.

group 54 – which plaintiff admits. Def. SF ¶ 68. Although plaintiff was demoted back to occupational group 50 in 1996, plaintiff cannot dispute that the Company could not have demoted him to occupational group 50 in 2001 because such demotion would violate Section 8.11 of the CBA, as the Company experienced layoffs in both occupational group 50 and 54 in 2001. Def. SF ¶ 61.[13]

Moreover, plaintiff cannot establish pretext given that the Company attempted to keep plaintiff employed rather than lay off plaintiff in May 2001. The Company asked the Union to provide it with a waiver for any breach of the CBA so that the Company could transfer plaintiff to a labor grade 3 position in occupational group 50 rather than lay off plaintiff. Def. SF ¶ 63. The Union refused. Def. SF ¶ 64. Thus, in accordance with the express terms of the CBA – and so as to not breach the CBA – the Company had to lay off plaintiff effective May 4, 2001. If the Company had the objective to lay off Mr. Baldyga due to his age, it would not have gone out of its way to request a waiver of the seniority provisions to transfer him to another occupational group.

As the Company has articulated a non-discriminatory reason for plaintiff's termination, and plaintiff has no evidence that the Company's reason is a pretext or that the Company intentionally discriminated against plaintiff because of his age, summary judgment must be granted.

---

[13]  Q:  Do you know if in 2001, given that there was a layoff in Occupational Group 54 and a layoff in Occupational Group 50, if the Company had demoted you and moved you from Occupational Group 54 to Occupational Group 50, would that violate the collective bargaining agreement?

A:  I have no idea.

Baldyga Dep. at 72.

II.    **SUMMARY JUDGMENT MUST BE GRANTED ON PLAINTIFF'S CFEPA CLAIM, AS PLAINTIFF'S CLAIM IS TIME-BARRED BECAUSE PLAINTIFF DID NOT FILE THIS ACTION WITHIN NINETY DAYS OF RECEIPT OF THE CHRO'S RELEASE OF JURISDICTION.**

Under the CFEPA, an individual can file a judicial complaint if the individual has filed a timely charge with the CHRO and obtained a release of jurisdiction. Conn. Gen. Stat. § 46a-100; Conn. Gen. Stat. § 46a-101(a). Any judicial action must be brought within ninety (90) days of the individual's receipt of the release of jurisdiction from the CHRO. Conn. Gen. Stat. § 46a-101(e); *Golnik v. Amato,* 299 F. Supp. 2d 8, 13 (D. Conn. 2003); *Duncan v. Junior Achievement, Inc.,* 2001 Conn. Super. LEXIS 1149 (Conn. Super. Ct. Apr. 24, 2001) (copy attached). The requirement that a complaint be filed within 90 days of receipt of a release of jurisdiction is ***mandatory***. *Golnik,* 299 F. Supp. 2d at 13-14; *Kinkade v. Dana Wiseman, M.D., P.C.,* 1997 Conn. Super. LEXIS 3532, at *10-20 (Conn. Super. Ct. Dec. 30, 1997) (copy attached) (discussing *Angelsea Prods., Inc. v. CHRO,* 236 Conn. 681, 674 A.2d 1300 (1996)).

Plaintiff's release of jurisdiction from the CHRO was issued on March 3, 2002. Def. SF ¶ 97. Plaintiff received the release of jurisdiction on March 6, 2002. Def. SF ¶ 98. Accordingly, the 90 day period began to run on March 6, 2002. Plaintiff did not file his complaint until July 2, 2002 – ***118 days later***. Plaintiff, therefore, has not filed his complaint within 90 days of his receipt of the release. Accordingly, plaintiff's CFEPA claim is time-barred, and summary judgment must be granted on this claim. *See, e.g., Golnik,* 299 F. Supp. 2d at 13-14 (dismissing CFEPA claims against certain defendants, as the court lacked jurisdiction over such claims because defendants became parties to the suit more than 90 days after release of jurisdiction from CHRO); *Duncan,* 2001 Conn. Super. LEXIS 1149; *Kinkade,* 1997 Conn. Super. LEXIS 3532, at *19-20; *Shyrer v. Associated Pulmonologists of Western Connecticut,* 1996 Conn. Super. LEXIS 974, at *2-8 (Conn. Super. Ct. Apr. 15, 1996) (copy attached); *see also Distasi v. Sikorsky*

28

*Aircraft Corp.,* 1999 U.S. Dist. LEXIS 18941, at \*11 n.3 (D. Conn. Nov. 29, 1999) (copy

attached) (recognizing that plaintiff's suit was not timely where plaintiff did not comply with the

90 day requirement).

**III.     PLAINTIFF'S CFEPA CLAIM IS PREEMPTED BY SECTION 301 OF THE LMRA AND SUMMARY JUDGMENT MUST BE GRANTED, AS PLAINTIFF'S CLAIM IS SUBSTANTIALLY DEPENDENT UPON AN INTERPRETATION OF THE COLLECTIVE BARGAINING AGREEMENT GOVERNING PLAINTIFF'S EMPLOYMENT.**

Section 301 of the Labor Management Relations Act, 1947, ("LMRA"), 29 U.S.C. § 185,

confers subject matter jurisdiction on the federal courts over cases involving collective

bargaining agreements.  29 U.S.C. § 185; *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S.

399, 403 (1988); *Wilhelm v. Sunrise Northeast, Inc.*, 923 F. Supp. 330, 334 (D. Conn. 1995).

Section 301, however, is more than just a jurisdictional statute; it creates a body of substantive

federal labor law which completely preempts the field.  *See generally Livadas v. Bradshaw*, 512

U.S. 107, 121 (1994); *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1,

23-24 (1983); *Dittman v. General Motors Corp. -- Delco Chassis Div.*, 941 F. Supp. 284, 288 (D.

Conn. 1996) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-11 (1985)), *aff'd without

op.* 116 F.3d 465 (2d Cir. 1997).

In enacting Section 301, Congress intended that uniform federal labor law would prevail

over inconsistent local rules.  *See Vera v. Saks & Co.*, 335 F.3d 109, 114 (2d Cir. 2003); *Jenkins

v. Area Cooperative Educ. Servs.*, 2004 U.S. Dist. LEXIS 3353, at \*2-3 (D. Conn. Feb. 25, 2004)

(copy attached) (quoting *Wilhelm*, 923 F. Supp. at 334); *Dittman*, 941 F. Supp. at 288 (citing

*Allis-Chalmers*, 471 U.S. at 209-10); *Almonte v. The Coca-Cola Bottling Co. of New York, Inc.*,

959 F. Supp. 569, 576 (D. Conn. 1997) (citing *Lingle*, 486 U.S. at 405-06); *Anderson v. The*

*Coca-Cola Bottling Co. of New York, Inc.*, 772 F. Supp. 77, 80 (D. Conn. 1991) (citations omitted).

Disputes regarding the meaning of contract terms and the consequences of a contract breach must be resolved according to the LMRA. *Allis-Chalmers*, 471 U.S. at 211; *Wilhelm*, 923 F. Supp. at 334; *Anderson*, 772 F. Supp. at 80. When resolution of a plaintiff's state law claim depends upon interpretation of the collective bargaining agreement, "'that claim must either be treated as a § 301 claim or ***dismissed*** as preempted by federal labor-contract law.'" *Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561, 572 (2d Cir. 1995) (citing *Lueck*, 471 U.S. at 220) (emphasis added); *see also Vera*, 335 F.3d at 114; *Notice v. Chanler Lewis, Inc.*, 333 F. Supp. 2d 28, 30 (D. Conn. 2004); *Dittman*, 941 F. Supp. at 288 (citing *Lueck*, 471 U.S. at 220). To determine if a plaintiff's claim is preempted by Section 301, the Court must scrutinize the claim to determine if it is independent of any rights established by the contract, or if the claim is intertwined with consideration of the terms of the collective bargaining agreement. *Jenkins*, 2004 U.S. Dist. LEXIS 3353, at *4 (citing *Carvalho v. International Bridge & Iron Co.*, 2000 U.S. Dist. LEXIS 4419, at *2 (D. Conn. Feb. 25, 2000)).

In an attempt to demonstrate pretext, plaintiff alleges that the Company "manipulated the process" by placing older workers in inappropriate occupational groups, thereby exposing them to layoff, and that plaintiff was placed in an occupational group where all the people with less seniority in the occupational group were protected from layoff. Compl. ¶ 9; Baldyga Dep. at 30-31, 39-44. Plaintiff further claims that he was discriminated against because of his age when he was laid off in 2001, because in 1996 he was demoted instead of being laid off and the only difference between 1996 and 2001 was that plaintiff was older in 2001. Baldyga Dep. at 69.

Based upon the foregoing, there can be no doubt that the Court will be required to interpret and apply the CBA in order to resolve plaintiff's CFEPA claim. The gravamen of plaintiff's claim involves the propriety of his selection for layoff in 2001. The process by which layoffs are conducted is clearly governed by the CBA and any inquiry into whether plaintiff was properly laid off will require the Court to interpret the CBA.

Article I of the CBA provides the Company with the sole right and responsibility to determine the size of the workforce and the sole right and responsibility to lay off employees. Def. SF ¶¶ 28-29. Pursuant to the terms of the CBA, hourly employees are laid off based upon seniority within non-interchangeable occupational groups following the procedure set forth in the CBA. Def. SF ¶¶ 40-42.

Plaintiff's contention that he was inappropriately placed in occupational group 54 and therefore laid off with other occupational group 54 employees clearly requires interpretation of the CBA. Indeed, plaintiff filed a grievance concerning his layoff, alleging that he was "miss classified in [occupational] group 54," Def. SF ¶ 94, clearly recognizing that his contention is governed by an interpretation of the CBA.

To determine whether plaintiff was properly selected for layoff within occupational group 54 will likewise require an interpretation of the CBA. The Court will be required to examine and interpret the layoff procedure set forth in Article VIII of the CBA, as well as Letter 18, which exempts certain positions from layoff. Moreover, as set forth in Argument I, *supra*, plaintiff cannot demonstrate that his termination occurred under circumstances which give rise to an inference of discrimination, and the Company has a legitimate non-discriminatory reason for his layoff, as the layoff was conducted solely based on seniority and strictly followed the terms

31

of the CBA. *See also* Compl. ¶ 9. Thus, the CBA is at the center of plaintiff's discrimination claim and plaintiff's claim cannot be resolved without interpreting the CBA.

Further, whether plaintiff should have been demoted in 2001 instead of laid off likewise requires an interpretation of the CBA. The circumstances surrounding the layoff in 2001 differed from those in 1996. In 1996, a layoff was conducted in occupational group 50, but not occupational group 54. Def. SF ¶¶ 16-18. In 2001, a layoff was conducted in both occupational group 50 and occupational group 54. Def. SF ¶ 68. Because there was a layoff in occupational group 50 and 54 in 2001, the Company could not demote plaintiff back to occupational group 50, as to do so would have been a violation of Section 8.11 of the CBA. Def. SF ¶ 61. Thus, a determination of whether plaintiff was properly laid off instead of demoted in 2001 will require the Court to interpret the CBA.

The provisions of the CBA required to be interpreted in this case are similar to those in *Fant v. New England Power Serv. Co.*, 239 F.3d 8 (1st Cir. 2001), where the plaintiff alleged he was discriminated against for exercising his rights under the state's workers' compensation statute. Finding that the plaintiff's claim was preempted because it required an interpretation of the collective bargaining agreement, the First Circuit stated:

> As best we can tell from the complaint, Fant's case involves recent leave-time for recovery from a work-related injury, a lay-off, a subsequent request for reassignment to a different type of job, seniority and his availability for immediate reemployment. Disputes relating to such matters are usually CBA-based disputes because the rights at issue are created by the agreement. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 218, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985). Similarly, questions relating to qualifications and seniority usually require recourse to details that are imbedded in CBAs. *See O'Brien v. Consolidated Rail Corp.*, 972 F.2d 1, 5 (1st Cir. 1992) (regarding Chapter 151B and Railway Labor Act preemption); *Wilhelm v. Sunrise Northeast, Inc.*, 923 F. Supp. 330 (D. Conn. 1995).

*Fant*, 239 F.3d at 15. Recognizing that the agreement at issue established a procedure for layoff

and rehire, which provided that in the case of a reduction in a class of work, the last man hired is

the first man let go, and that the last man furloughed will be the first to be rehired, the First

Circuit concluded that the employee's "entitlement to employment" depends upon an

interpretation of the CBA. *See id.* at 15. The Court further recognized that the CBA contained a

broad management rights clause. *Id.* at 16. The CBA at issue herein contains similar provisions

which the Court will be required to interpret in this case.

Accordingly, plaintiff's CFEPA claim is preempted by Section 301 and summary

judgment must be granted. *See Wilhelm*, 923 F. Supp. at 337 (holding plaintiff's sexual

orientation discrimination claim under the CFEPA preempted by Section 301); *see also Tifft v.*

*Commonwealth Edison Co.*, 366 F.3d 513, 519-20 (7th Cir. 2004) (denying motion to remand

wrongful termination claim on the grounds that the claim is preempted by Section 301, finding

that claim required analysis of "the process the Defendants used to lay off and rehire employees

postmerger, pay severance and other benefits, recall laid-off workers, and handle employee

grievances"); *Audette v. International Longshoremen's & Warehousemen's Union*, 195 F.3d

1107, 1113 (9th Cir. 1999) (preempting state law discrimination and retaliation claim where

defendant's legitimate non-discriminatory reason requires interpretation of collective bargaining

agreement); *Davis v. Johnson Controls, Inc.*, 21 F.3d 866, 868 (8th Cir.), *cert. denied*, 513 U.S.

964 (1994) (preempting handicap discrimination claim under Missouri Human Rights Act, as

relocation of plaintiff to a position commensurate with his physical limitations required

examination of the seniority rights of plaintiff and other employees under collective bargaining

agreement); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 487 (5th Cir.), *cert. denied*,

519 U.S. 864 (1996) (affirming denial of motion to remand because discrimination claim under

Texas law preempted where claim turns on issues of promotion, seniority and assignment to training, employer will rely on collective bargaining agreement for its non-discriminatory reason, and court will have to interpret collective bargaining agreement when plaintiff attempts to demonstrate pretext because plaintiff will have to challenge defendant's rights under collective bargaining agreement).[14]

## CONCLUSION

For the foregoing reasons, defendant Sikorsky Aircraft Corporation respectfully requests that the Court grant its motion for summary judgment and dismiss plaintiff's complaint in its entirety, with prejudice.

---

[14]    *See also Moreno v. STP Nuclear Operating Co.*, 172 F. Supp. 2d 857, 859-60 (S.D. Tex. 2001) (denying motion to remand and finding that federal question jurisdiction exists pursuant to § 301 over claim that denied temporary supervisory position because of national origin, in violation of Texas anti-discrimination law, where promotion to such position falls within collective bargaining agreement and employer's non-discriminatory reason for conduct will require interpretation of collective bargaining agreement); *Jackson v. Local Union 542, Int'l Union – Operating Eng'r*, 2000 U.S. Dist. LEXIS 10609, at *6-8 (E.D. Pa. July 25, 2000) (copy attached) (allegation that union made employment decisions based on race in violation of Pennsylvania Human Rights Law preempted as claim would require an analysis of the collective bargaining agreement to determine whether decision was "based not on the agreement, but on racially impermissible reasons"); *Cox v. United Parcel Serv., Inc.*, 2000 U.S. Dist. LEXIS 407, at *6-10 (E.D. La. Jan. 12, 2000) (copy attached) (denying motion to remand where state age and race discrimination claims were preempted because resolution required interpretation of collective bargaining agreement to see if defendant acted within scope of collective bargaining agreement); *Jupiter v. Bellsouth Telecomms., Inc.*, 1999 U.S. Dist. LEXIS 17431, at *12-15 (E.D. La. Nov. 4, 1999) (copy attached) (state law age discrimination claim preempted where issue of whether plaintiff was replaced by younger employee and was not rehired for a position for which plaintiff claimed to be qualified required interpretation of collective bargaining agreement).

Respectfully submitted

_Anessa Abrams_

Gary L. Lieber (ct13839) (gll@saslaw.com)
Anessa Abrams (ct16594) (aa@saslaw.com)
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Ave., N.W.
Suite 1000
Washington, D.C.  20037-1922
Phone (202) 333-8800
Fax (202) 625-3301

Edward J. Dempsey (ct05183)
Labor Counsel
United Technologies Corporation
United Technologies Building
Hartford, CT 06101
(860) 728-7858
(860) 728-6551 (fax)

Attorneys for Defendant
Sikorsky Aircraft Corporation