## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RAYMOND P. BALDYGA, JR., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 3:02 CV 1141 (JCH) |
| v. | : | |
| | : | |
| SIKORSKY AIRCRAFT | : | January 20, 2005 |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Civil Rule 56(a)1, defendant Sikorsky Aircraft Corporation ("Sikorsky

Aircraft" or "the Company") hereby submits this Statement of Material Facts as to Which There

is No Genuine Issue to be Tried.

1.      Plaintiff Raymond P. Baldyga, Jr. began working at Sikorsky Aircraft on July 11,

1977 as an Inspection Crib Attendant in department 1530, job code 6908, occupational group 69,

labor grade 9. Baldyga Dep. at 12;[1] Baldyga Arb. (Vol. II) at 87; Declaration of Thaddeus

Garbien ("Garbien Decl.") Exh. A.

2.      The first two numbers of the job code identify the occupational group. Garbien

Arb. (Vol. I) at 32-33.

---

[1]      All cited deposition testimony is attached to the Declaration of Anessa Abrams, Esquire
("Abrams Decl."), submitted herewith.  Such citations are in the format of an individual's last
name followed by "Dep."  All citations in the format of an individual's last name followed by
"Arb." refer to testimony given during the arbitration hearing in *In the matter of the Arbitration
between Teamsters Local 1150 and Sikorsky Aircraft Corporation (Grievant: Ray Baldyga)*,
conducted on May 10, 2002 and October 3, 2002.  All cited arbitration testimony is attached to
the Abrams Decl.

3.     The occupational groups are negotiated and agreed upon between the Company and International Brotherhood of Teamsters, Local 1150 ("Local 1150" or "the Union"). Garbien Decl. ¶ 4 & Exh. B, Article VIII, Section 8.6 (p. 32) and Appendix A (p. 58-59); *see also* Baldyga Dep. at 30.

4.     Occupational groups are used for layoff and recall purposes only.  Garbien Arb. (Vol. I) at 32-33; Garbien Decl. Exh. B, App. A (p. 58-59).

5.     During his entire tenure with the Company, plaintiff was a member of the bargaining unit whose employment was governed by the terms and conditions of a Collective Bargaining Agreement ("CBA") between the Company and Local 1150.  Baldyga Dep. at 12-13; Garbien Decl. ¶ 4 & Exh. B.

6.     The CBA applies company-wide to bargaining unit employees of all ages.  *See* Garbien Decl. Exh. B, Article II (p. 3).

7.     On February 20, 1978, plaintiff was promoted to Inspector Standard Parts, department 1530, job code 5002, occupational group 50, labor grade 8.  Garbien Decl. Exh. A; Baldyga Arb. (Vol. II) at 88.

8.     On April 30, 1979, plaintiff was promoted to Inspector Machined Parts, department 1530, job code 5001, occupational group 50, labor grade 6.  Garbien Decl. Exh. A.

9.     On April 18, 1983, plaintiff was promoted to Inspector – Parts and Layout, department 1530, job code 5009, occupational group 50, labor grade 4.  Garbien Decl. Exh. A; Garbien Arb. (Vol. II) at 126.

10.    On June 15, 1987, plaintiff was promoted to Senior Layout Inspector, department 1530, job code 5006, occupational group 50, labor grade 3.  Garbien Decl. Exh. A; Garbien Arb. (Vol. II) at 126.

11.     Employees in Department 1530 (Receiving Inspection) were responsible for inspecting parts that were manufactured offsite by suppliers and transported to Sikorsky Aircraft where they would be inspected by Department 1530 employees before being installed as a component part of the helicopter assembly process. Declaration of Mark Lindsey ("Lindsey Decl.") ¶ 6. The inspections were conducted on an audit basis, with those suppliers who had better quality records having their parts inspected on a less frequent audit schedule. *Id.*

12.     The promotional path for employees in occupational group 50 is to move within occupational group 50 from a labor grade 8 to a labor grade 6 to a labor grade 4 to a labor grade 3 position. Garbien Arb. (Vol. II) at 140. Once an individual reaches the point of being promoted to the labor grade 2 Working Leader – Receiving & Layout Inspection position, the employee crosses over to occupational group 54. Garbien Arb. (Vol. II) at 129, 140. As of May 2001, this promotional path had been in existence for approximately 35 years. Garbien Arb. (Vol. II) at 140.

13.     The purpose of crossing over to a different occupational group as the working leader is so that the working leader can effectively work with employees in more than one occupational group. With respect to the Working Leader – Receiving & Layout Inspection position, job code 5420, labor grade 2, this position enabled the working leader to direct and assign work to employees in both occupational group 50 and occupational group 54. Garbien Arb. (Vol. II) at 140-41.

14.     There are other instances in the Company where the promotional path for positions crosses over to a different occupational group. Garbien Arb. (Vol. II) at 144-47.

3

15.    Following his promotional path, on May 3, 1993, plaintiff was promoted to Working Leader – Receiving & Layout Inspection, department 1530, job code 5420, occupational group 54, labor grade 2. Garbien Decl. Exh. A; Garbien Arb. (Vol. II) at 126.

16.    In May 1996, due to a downturn in business, the Company needed to reduce the number of employees in occupational group 50 and conducted a layoff within that occupational group. Garbien Arb. (Vol. II) at 128; *see also* Garbien Decl. ¶ 10; Baldyga Dep. at 71, 72.

17.    In May 1996, there was no layoff in occupational group 54. *See* Garbien Arb. (Vol. II) at 129; *see also* Garbien Decl. ¶ 10.

18.    Plaintiff cannot dispute that in May 1996 there was no layoff in occupational group 54. Baldyga Dep. at 70-72.

19.    After the 1996 layoff in occupational group 50 was concluded, the Company determined that there was a need for fewer employees in the position of Working Leader – Receiving & Layout Inspection, job code 5420, labor grade 2, as there were now fewer employees to whom the working leaders directed and assigned work. Garbien Arb. (Vol. II) at 128.

20.    Based solely on seniority, plaintiff was demoted on May 27, 1996 from his labor grade 2 occupational group 54 working leader position to the position of Senior Layout Inspector, department 1530, occupational group 50, labor grade 3. Garbien Decl. Exh. A; Garbien Arb. (Vol. I) at 65-66; Garbien Arb. (Vol. II) at 126-28; *see also* Baldyga Dep. at 70.

21.    Plaintiff claims that, as a result of his 1996 demotion, he first became aware that the labor grade 2 working leader position which he had held was actually within occupational group 54. Baldyga Arb. (Vol. II) at 99-100.

22.     On May 4, 1998, as a result of a grievance, plaintiff was promoted back to the

Working Leader – Receiving and Layout Inspection position in occupational group 54, labor

grade 2. Garbien Decl. ¶ 5 & Exh. A; Baldyga Arb. (Vol. II) at 101-02; Garbien Arb. (Vol. II) at

127. Again, plaintiff was aware that the labor grade 2 position he was employed in was in

occupational group 54. Baldyga Arb. (Vol. II) at 111-12.

23.     Plaintiff remained in the Working Leader – Receiving and Layout Inspection

position in occupational group 54, labor grade 2, until his layoff in May 2001. *See* Garbien Decl.

Exh. A; Garbien Arb. (Vol. II) at 132; *see also* Baldyga Dep. at 19.

24.     Plaintiff worked in department 1530 for his entire career at Sikorsky Aircraft

prior to the May 2001 layoff. Garbien Arb. (Vol. I) at 69-70; Baldyga Dep. at 15-16.

25.     Sikorsky Aircraft has long maintained a policy against discrimination and treats

all employees on the basis of their qualifications, without regard to, among other things, age, sex,

race, color, religion, national origin or disability. Garbien Decl. ¶ 6. This policy is set forth in

the Company's Hourly Employee Manual, which is provided to all hourly employees, and

emphasizes that it is Sikorsky Aircraft's policy "to recruit, hire, train and promote employees in

all job classifications without regard to race, color, age, religion, sex, handicap, national origin,

marital or veteran status." *Id.* & Exh. C.

26.     The Company's policy against discrimination is reiterated every year through

General Notices. It is the Company's policy that these General Notices are routinely posted on

all bulletin boards in all Sikorsky Aircraft facilities. Garbien Decl. ¶ 6 & Exh. D.

27.     Article IV of the CBA between the Company and the Union likewise prohibits

discrimination:

> The Company and the Union recognize that employees covered by this agreement
> may not be discriminated against in violation of the provisions of the Labor

5

Management Relations Act of 1947, as amended, on the basis of membership or nonmembership in the Union, or on the basis of race, color, sex, age, religion, national origin, veteran status, or disability.

Garbien Decl. Exh. B, Article IV (p. 5).

28.    Article I of the CBA, entitled "Management Functions," provides that the

Company has the sole right and responsibility to determine the size of the workforce:

It is recognized that in addition to other functions and responsibilities the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine . . . the size and number of the working force in the active employ of the Company from time to time; . . .

Garbien Decl. Exh. B, Article I, Section 1.1 (p. 2).

29.    The CBA further provides that the Company has the right to lay off employees:

It shall also have the right and responsibility to promote, demote and transfer employees, and to discharge, suspend, or otherwise progressively discipline any employee for just cause, and to lay off because of lack of work or other cause, unless otherwise hereinafter provided.

Garbien Decl. Exh. B, Article I, Section 1.2 (p. 2).

30.    In January 1993, there were 5914 bargaining unit employees in the Company's

Connecticut and West Palm Beach facilities. Garbien Decl. ¶ 14.

31.    In January 1999, there were 4078 bargaining unit employees in the Connecticut

and West Palm Beach facilities. Garbien Decl. ¶ 14.

32.    More than 90% of the bargaining unit employees are located in Connecticut.

Garbien Decl. ¶ 14.

33.    As a result of a continued downturn in its government and commercial business,

Sikorsky Aircraft continued to repeatedly downsize its workforce and both hourly and salaried

workforce reduction programs were implemented. Garbien Decl. ¶ 7.

6

34.    In early 1999, in accordance with the CBA, the Company implemented a voluntary early retirement program and provided hourly employees age 55 and over with 25 or more years of credited service with the option to voluntarily participate in the program and leave the Company.  Garbien Decl. ¶ 7 & Exh. B, Letter 26 (p. 119-20).

35.    Employees who chose to participate in the Voluntary Early Retirement Program received monetary benefits, as set forth in Letter 26 of the CBA.  *See* Garbien Decl. Exh. B, Letter 26 (p. 119-20).

36.    During 1999-2000, approximately 475 hourly employees voluntarily left the Company under the Voluntary Early Retirement Program.  Garbien Decl. ¶ 7.

37.    In 2001, the Company continued to evaluate its business conditions.  Garbien Decl. ¶ 7.

38.    During 2001, when department headcounts were required to be reduced, the Company, in some cases, reassigned supervisors back to hourly positions within the bargaining unit.  Garbien Decl. ¶ 7.

39.    During 2001, the Company closed a satellite facility and consolidated some manufacturing operations in order to become more efficient and reduce costs.  Garbien Decl. ¶ 7.

40.    Involuntary hourly workforce reductions were implemented due to a decrease in the Company's volume of work and a requirement to reduce cost to enhance the Company's worldwide competitiveness.  Garbien Decl. ¶ 7.  All hourly involuntary workforce reductions are carried out in accordance with the terms of the CBA.  *Id.*

41.    Pursuant to the terms of the CBA, hourly employees subject to layoff are chosen by reverse seniority within non-interchangeable occupational groups.  Garbien Decl. ¶ 7 & Exh.

B, Article VIII (p. 31-39); Garbien Arb. (Vol. I) at 40-41; Garbien Arb. (Vol. II) at 138; *see also*

Baldyga Arb. (Vol. II) at 110-11; Lucas Dep. at 36.    Specifically, the CBA provides:

> In case of indefinite layoff for lack of work, employees shall be laid off and
> recalled by non interchangeable occupational groups in accordance with their
> seniority (length of continuous service with the Company since the most recent
> date of hire).

Garbien Decl. Exh. B, Article VIII, Section 8.1 (p. 31).

42.     When layoffs in the hourly workforce are necessary, the CBA provides the

procedure to be applied:

> Whenever layoffs are necessary to reduce the working force in any job
> classification, the following procedure shall be applied:

(a)     Probationary employees, if any, who are classified in the affected
occupational group in labor grades the same as or lower than the job
classification which requires reduction, shall first be laid off in whatever
numbers are necessary, provided there remain other employees with
seniority who are qualified and willing to perform the remaining work.

(b)     Thereafter, employees with seniority classified in the affected job
classification in the particular occupational group, but whose seniority is
insufficient to entitle them to remain in their job classification shall be
transferred, reclassified in a job in a lower labor grade, or laid off in
accordance with the following:

    (1)     An employee with seniority who is excess as a result of reduction
in force in his/her job classification (or an employee who is
displaced by a senior employee, as provided below) will displace
an employee of lesser seniority in the following order:

        (a)     The least senior employee in a job classification of the
same labor grade in the particular occupational group.

        (b)     The least senior employee in the next and succeeding lower
labor grades until the lowest labor grade in the particular
occupational group is reached.

    (2)     An employee whose seniority is insufficient to displace any other
employee in any other job classification of the same or lower labor
grade in the same occupational group shall be laid off, provided

8

> there remain other employees with more seniority who are
> qualified to perform the remaining work.

Garbien Decl. Exh. B, Article VIII, Section 8.3 (p. 31-32).

43.    The CBA provides that certain job classifications are exempt from layoff since the

employees in those positions possess critical skills:

> This is to confirm the understanding and agreement reached at recent contract
> negotiations between Sikorsky Aircraft Corporation and the Sikorsky Teamsters
> Local No. 1150 of the International Brotherhood of Teamsters concerning the
> potential exclusion from layoff of employees with critical skills.
>
> The parties agree there exist certain job classifications deemed critical to the
> operation of the business, and thus necessary for the company to retain employees
> in these job classifications during periods of layoff. In the event of a layoff and
> the need for retention of critical skills, Article VIII language will apply for those
> job classifications listed below.
>
> - All VH Job Classifications
> - Autoclave Operator
> - Senior Composite Worker – Fabric Cutter
> - Composites Repairer
> - Composites Inspector with Ultrasonic Test Certification
> - Inspector/Programmer
> - All DMIR, DAR, ODAR Job Classifications
> - All Gear Machining and Gear Grinder Job Classifications
>
> *        *        *
>
> Other than such cases where critical skills apply, seniority will be the guiding
> factor within the Occupational Group.
>
> *        *        *

Garbien Decl. Exh. B, Letter 18 (p. 105); *see also* Baldyga Dep. at 30-31; Lucas Dep. at 37.

44.    The Company had long considered certain jobs "critical" and in 1996, the

Company and the Union memorialized the list deemed critical in Letter 18 of the CBA. Garbien

Decl. ¶ 8. Because employees in occupational groups frequently exist in more than one

department, it was essential that this critical skills protection exist. *Id.* For example, the "VH"

9

jobs include all Presidential helicopter positions. Such jobs require security clearances that regularly take a year or more to obtain. *Id.* The Company was thus required, as a matter of business exigency, to protect employees in those jobs – regardless of their seniority – so as to guarantee there will be a sufficient number of employees performing work on the Presidential fleet of helicopters even if there were a significant layoff affecting occupational groups that occupy the VH/Presidential department as well as other departments. *Id.* Stated otherwise, but for Letter 18, because employees are laid off in reverse seniority order within an occupational group scheduled for layoff, junior employees working within the VH Department would be subject to layoff, leaving the Company with a manpower shortage in an important project which cannot be backfilled by the transfer of more senior employees in the same occupational group because such employees lack the security clearance to work on the VH/Presidential fleet. *Id.*

45.     Many of the other jobs on the Letter 18 list deal with jobs within occupational groups that require specialized knowledge obtained on the job. But for Letter 18, more senior employees in the same occupational group would backfill into those jobs when layoffs occur in that particular occupational group but they would lack the skills and experience to perform those important jobs. Garbien Decl. ¶ 8.

46.     In the Spring of 2001, prior to the May 2001 layoff, several managers within the Product Integrity Department – Jim Miranti (Vice President, Product Integrity), James Nastri (Director, Product Integrity), John DePuma (Co-Captain, Product Integrity), and Mark Lindsey (Leader, Supplier Quality) – met on numerous occasions to determine the future course of how Sikorsky Aircraft would inspect supplier manufactured parts. Lindsey Decl. ¶ 7.

47.     At these meetings, based on the managers' recommendation, Jim Miranti decided to make a fundamental change in the inspection process for supplier manufactured parts,

concluding that the general practice of inspecting supplier parts at Sikorsky Aircraft was not the most economic and efficient manner of performing these inspections. Lindsey Decl. ¶ 7. Instead, it made more sense to shift these inspections to the source of manufacturing, as this would enable Sikorsky Aircraft to resolve problems quickly and have the supplier inspectors resolve issues on the spot and enable point of use shipment of material. *Id.* & Exh. A.  In contrast, under the then current practice of conducting inspections at Sikorsky Aircraft, if there was a problem with a part, the Company would frequently have delays in communicating with the supplier and would regularly have to return parts to the suppliers' place of business. It could take 60 days or more to get the material corrected and returned. *Id.* ¶ 7.

48.    The Company further determined that moving inspections to the source would result in a substantial financial savings to Sikorsky Aircraft in excess of $350,000 for one year. Lindsey Decl. ¶ 7 & Exh. B.

49.    In light of this business decision to move the vast number of inspections to the source of manufacturing, there would be a substantial reduction in the amount of work performed in Department 1530. Lindsey Decl. ¶ 8.

50.    Based on this business decision, the Company determined that Department 1530 needed to immediately reduce its headcount by nine employees, reducing the number of employees in the department from 25 to 16. Lindsey Decl. ¶¶ 8 & 11 & Exh. C. The Company determined that five of the employees would be from occupational group 50 and four of the employees impacted would be from occupational group 54. Lindsey Decl. ¶ 8; Garbien Arb. (Vol. II) at 138.

51.    All of the working leaders in Department 1530 were in occupational group 54. Lindsey Decl. ¶ 8.

52.    The Company decided that, going forward, it would only need two Department 1530 working leaders, one for the first shift and one for the second shift. Since there were five working leaders in Department 1530, that would require the elimination of three of the five working leader positions. Lindsey Decl. ¶ 8.

53.    The Company further determined that within occupational group 54 the position of Receiving Inspector Bulk Items would no longer be required as, given the overall reduction in workload, the inspection work performed by this position could be absorbed by a more senior occupational group 50 inspector within Department 1530. Lindsey Decl. ¶ 8.

54.    Upon review of the seniority list for occupational group 54 and pursuant to the express terms of the CBA, the Company determined that the three most junior employees by seniority in occupational group 54 – Mary Poleio, Renaldo Garcia and Daniel Hespelt – were protected from layoff pursuant to Letter 18 of the CBA because they were employed in critically skilled positions. Garbien Decl. ¶ 9 & Exh. E (at p.2); Lindsey Decl. ¶ 9 & Exhs. D & E (at p.2); Garbien Arb. (Vol. II) at 137-38; *see also* Baldyga Dep. at 158-60.

55.    The next two most junior employees in terms of seniority – Paul Wojcicki and William Lucas – were not employed in critically skilled positions, and therefore were subject to layoff. Garbien Decl. ¶ 9 & Exh. E (at p.2); Garbien Arb. (Vol. II) at 138.

56.    Working up the seniority list, the next most junior employee by seniority – Gertrude Mcmillian – was employed in a critically skilled position and was, therefore, exempt from layoff pursuant to the CBA. Garbien Decl. ¶ 9 & Exh. E (at p.2); Lindsey Decl. ¶ 9 & Exhs. D & E (at p.2).

57.    The remainder of the employees in occupational group 54 in reverse seniority order were: Reba Gomes, plaintiff, Bruce Redmann, Joseph Lesko, and Adrian Stanley.

12

Garbien Decl. ¶ 9 & Exh. E (at p.2).  None of these individuals was employed in a critically skilled position.  Garbien Decl. ¶ 9 & Exh. E (at p.2).

58.   Plaintiff was not employed in a critically skilled position.  Baldyga Dep. at 31-32.

59.   Plaintiff was not protected from layoff under the CBA.  *See* Garbien Decl. ¶ 9.

60.   The four most junior employees in occupational group 54 who were not exempt from layoff pursuant to Letter 18 of the CBA because of critical skills were:  Paul Wojcicki, William Lucas, Reba Gomes and plaintiff.  Garbien Decl. ¶ 9 & Exh. E (at p.2); Garbien Arb. (Vol. II) at 138; Lindsey Decl. ¶ 9.  These four employees were slated to be laid off from occupational group 54 effective May 4, 2001.  Garbien Decl. ¶ 9.

61.   If the Company had demoted plaintiff back to the labor grade 3 position in occupational group 50 in May 2001 instead of laying off plaintiff, the Company would have violated Section 8.11 of the CBA between the Company and the Union, as both occupational group 50 and 54 were impacted by layoffs in 2001, Garbien Arb. (Vol. II) at 128-30; Garbien Decl. ¶ 10 & Exh. B, Article VIII, Section 8.11 (p. 33) – a fact which plaintiff cannot dispute.  Baldyga Dep. at 72.

62.   Section 8.11 was inserted into the CBA at the Union's behest so as to prevent the Company from moving a favored employee out of his or her occupational group and into another occupational group just prior to a layoff in the employee's original occupational group.  Garbien Decl. ¶ 10.  Thus, the provision states that the employee maintains seniority in the original occupational group for 60 days after being transferred to a different occupational group.  *Id.*

63.   As employees in occupational group 54 with high seniority were scheduled to be laid off, in April 2001, prior to the layoff, the Company's Manager of Human Resources, Thaddeus Garbien, asked Jeffrey Cederbaum, then Secretary/Treasurer of Local 1150, if the

13

Union wanted to give the Company a waiver for any breach of the CBA so that the Company could transfer plaintiff and Mr. Lucas back to a labor grade 3 position in occupational group 50 instead of laying off plaintiff and Mr. Lucas. Garbien Decl. ¶ 11; Garbien Arb. (Vol. II) at 130-31.

64.     Mr. Cederbaum refused to give the Company a waiver to place plaintiff and Mr. Lucas back into occupational group 50. Mr. Cederbaum informed Mr. Garbien that the Company should lay off employees in both occupational group 50 and 54 in seniority order. Garbien Decl. ¶ 11; Garbien Arb. (Vol. II) at 130-31.

65.     Paul Wojcicki, William Lucas, Reba Gomes and plaintiff were laid off from occupational group 54 effective May 4, 2001. Garbien Decl. ¶ 11 & Exh. F; Lindsey Decl. ¶ 9; Baldyga Arb. (Vol. II) at 102-03; Lucas Dep. at 38-39; *see also* Baldyga Dep. at 13-14.

66.     All employees junior to plaintiff in terms of seniority who remained employed in occupational group 54 were exempt from layoff pursuant to Letter 18 of the CBA. There was no employee junior to plaintiff who was not critically skilled who was not selected for layoff from occupational group 54. Baldyga Arb. (Vol. II) at 119-21; *see also* Baldyga Dep. at 30-31; Lucas Dep. at 37-38, 64-65; Garbien Decl. ¶ 11 & Exh. E (at p.2); Lindsey Decl. ¶ 9 & Exhs. D & E (at p.2).

67.     Plaintiff could not bump down to a lower labor grade within occupational group 54 since all of the employees junior to plaintiff in occupational group 54 were "critically skilled" and protected from any layoff, pursuant to Letter 18 of the CBA, regardless of their seniority. Lindsey Decl. ¶ 9 & Exhs. D & E (at p.2). There was no junior employee in occupational group 54 that plaintiff could displace. *Id.* ¶ 9.

68.     In May 2001, the Company conducted layoffs in both occupational group 50 and occupational group 54. Garbien Decl. ¶ 10 & Exh. F; Garbien Arb. (Vol. II) at 129-30; Baldyga Dep. at 71-72.

69.     Plaintiff's age played absolutely no part in his selection for layoff. Garbien Decl. ¶ 12; Lindsey Decl. ¶ 10.

70.     Plaintiff's manager at the time of the layoff did not know plaintiff's age. Lindsey Decl. ¶ 10.

71.     The age of any employee was not discussed during meetings regarding the Company's change in business plan nor was age discussed as being a factor in the Company's business decisions. Lindsey Decl. ¶ 10; Garbien Decl. ¶ 9.

72.     No one told plaintiff he was laid off because of his age. *See* Baldyga Dep. at 25; *see also* Lucas Dep. at 68.

73.     Plaintiff was selected for layoff based solely upon seniority within occupational group 54, pursuant to the express terms of the CBA. There was absolutely no other reason for plaintiff's selection for layoff. Garbien Decl. ¶ 12; Lindsey Decl. ¶ 10; *see also* Garbien Arb. (Vol. II) at 137-38.

74.     The layoff was conducted based solely upon seniority within occupational group 54, in accordance with the express terms of the CBA. Garbien Decl. ¶¶ 9, 12 & Exh. B, Article VIII, Sections 8.1, 8.3 (p. 31-32); Lindsey Decl. ¶ 10; *see also* Baldyga Arb. (Vol. II) at 110-11; Lucas Dep. at 36.

75.     The plaintiff was born in 1955. Compl. ¶ 4; Garbien Decl. Exh. G. Accordingly, at the time of the May 2001 layoff, plaintiff was 45 years old.

15

76.    In the May 2001 layoff, Sikorsky Aircraft retained employees in occupational group 54 who were the following ages at the time of the layoff: 55, 58, 50, 49, 34, 51 and 43. Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

77.    Three out of the four employees in occupational group 54 who were critically skilled and protected from layoff were over the age of 40. *See* Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

78.    All the employees who were retained in occupational group 54 because they had more seniority than plaintiff were over the age of 40. Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

79.    Plaintiff admits that Sikorsky Aircraft retained employees in occupational group 54 who were both older than plaintiff and over the age of 40. Baldyga Dep. at 28; *see also* Lucas Dep. at 38; Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

80.    In the May 2001 layoff, the Company laid off employees younger than plaintiff. Garbien Decl. ¶ 13 & Exhs. F & G; Baldyga Dep. at 28-29.

81.    In the May 2001 layoff, the Company laid off employees under the age of 40 – a fact which plaintiff cannot dispute. Garbien Decl. ¶ 13 & Exhs. F & G; *see* Baldyga Dep. at 29.

82.    The two incumbents who remained in the same position plaintiff held at the time he was laid off (occupational group 54, job code 5420, labor grade 2) were 49 and 51 years old at the time of the layoff. Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

83.    Prior to the layoff, the average age of the employees in occupational group 54 was 48.09; after the layoff, the average age of the employees in occupational group 54 increased to 48.57. Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G.

84.    The average age of employees still actively employed in occupational group 54 after the layoff was greater than plaintiff's age at that same time. *Compare* Garbien Decl. ¶ 13 & Exhs. E (at p.2), F & G *with* Compl. ¶ 4.

85.    A total of 24 employees from numerous departments and occupational groups were involuntarily laid off in May 2001. Garbien Decl. ¶ 13 & Exh. F.

86.    A total of 26 employees were actually laid off in May 2001, but two of the employees – David Garcia and Charles Vives – took a voluntary layoff. Garbien Decl. ¶ 13 & Exh. F.

87.    As a result of the May 2001 layoff, the number of bargaining unit positions in Department 1530 (Receiving Inspection) decreased from 25 to 16. Lindsey Decl. ¶ 11.

88.    As the Company continues to make process improvements, it has continued to reduce the size of Department 1530. Lindsey Decl. ¶ 11.

89.    Department 1530 currently has only 12 bargaining unit employees. Lindsey Decl. ¶ 11.

90.    By the time the training of outside suppliers is completed in 2005, it is planned that there will be approximately five employees in Department 1530. Lindsey Decl. ¶ 11.

91.    After the May 2001 layoff, there were 3397 bargaining unit employees in the Company's Connecticut and West Palm Beach facilities. Garbien Decl. ¶ 14.

92.    Plaintiff has no personal knowledge as to why the Company would have to conduct layoffs in certain areas, other than because of lack of work. Baldyga Dep. at 35, 91-93.

93.    Plaintiff has no evidence that the Company "manipulated the process" thereby resulting in his layoff, as alleged in his complaint. *See* Baldyga Dep. at 44-45.

94.    On May 2, 2001, plaintiff filed a grievance concerning his layoff, alleging that he was "miss classified in [occupational] group 54." Garbien Decl. Exh. K.

95.    On or about September 20, 2001, plaintiff filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging that he was terminated and retaliated against because of his age. Garbien Decl. Exh. H.

96.    On February 11, 2002, the CHRO dismissed plaintiff's charge concluding, among other things, that plaintiff was "not discharged due to [his] age, 45 years old" and that "the record indicates that [plaintiff] was discharged due to a reduction in force brought about by changes in respondent's business." Garbien Decl. Exh. I.

97.    On March 3, 2002, the CHRO issued plaintiff a Release of Jurisdiction. Garbien Decl. Exh. J.

98.    Plaintiff received the Release of Jurisdiction from the CHRO on March 6, 2002. Baldyga Dep. at 98-99.

99.    The Equal Employment Opportunity Commission issued plaintiff a Dismissal and Notice of Rights on April 24, 2002. Abrams Decl. Exh. E.

100.    On July 2, 2002, plaintiff filed his complaint in this matter, alleging that the Company discriminated against him because of his age by laying him off in May 2001, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-58 *et seq.* ("CFEPA"). *See* Complaint.

18

101. Plaintiff was rehired by the Company as a Kit Assembler, job code 7023, labor grade 8, on November 19, 2001 and has subsequently been promoted. Garbien Decl. Exh. A; Baldyga Dep. at 126-27.

102. The Company designed a labor grade 2 Working Leader position in Department 1580 in 1999. Department 1580 is fundamentally different than Department 1530. Department 1580 involves the inspection of internally produced machined parts. In addition to the fact that the parts being inspected are frequently of a different nature, the Department 1580 inspections all involve a full 100% inspection and not just an audit-based inspection. As set forth in the two job descriptions, the Department 1580, labor grade 2, occupational group 50 (job code 5019-2) Working Leader position commenced in 1999 is a completely different job than the Department 1530, occupational group 54 job held by plaintiff. Neither the Union nor plaintiff ever complained or grieved that the job (5420-2 Working Leader Inspection) was too narrow or that it should have been combined with the Working Leader position that was exclusively located in Department 1580, Machine Shop Inspection, where plaintiff has *never* worked. Garbien Arb. (Vol. I) at 61-63, 75-76; Garbien Arb. (Vol. II) at 134-35; Abrams Decl. Exhs. F & G.

Respectfully submitted

Gary L. Lieber (ct13839) (gll@saslaw.com)
Anessa Abrams (ct16594) (aa@saslaw.com)
SCHMELTZER, APTAKER & SHEPARD, P.C.
2600 Virginia Ave., N.W.
Suite 1000
Washington, D.C. 20037-1922
Phone (202) 333-8800
Fax (202) 625-3301

Edward J. Dempsey (ct05183)
Labor Counsel
United Technologies Corporation
United Technologies Building
Hartford, CT 06101
(860) 728-7858
(860) 728-6551 (fax)

Attorneys for Defendant
Sikorsky Aircraft Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S LOCAL**

**RULE 56(a)1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO**

**GENUINE ISSUE TO BE TRIED** was served by first class United States mail, postage

prepaid, on this $\underline{19}$ day of January, 2005, addressed to the following:

> Raymond P. Baldyga, Jr.
> 134 Delaware Road
> Easton, CT 06612
>
> *Pro se* plaintiff

Anessa Abrams

BC0055

21