# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

# FILED

RAYMOND P. BALDYGA, JR.,  :

      Plaintiff,  :    Civil Action No.
             :    3:02 CV 1141 (JCH)

   v.  :

SIKORSKY AIRCRAFT  :    January 21, 2005
CORPORATION,  :

      Defendant.  :

2005 JAN 20  A 11: 42

U.S. DISTRICT COURT
BRIDGEPORT, CONN

## DECLARATION OF MARK LINDSEY

I, Mark Lindsey, hereby declare as follows:

1.     I am currently employed by defendant Sikorsky Aircraft Corporation ("Sikorsky Aircraft" or "the Company") in the position of Manager, Product and Process Integrity, Supplier Quality. I am making this declaration based on personal knowledge.

2.     My date of birth is ███████, 1955.

3.     I have worked for Sikorsky Aircraft for 26 years. All of those years were spent in the Product Integrity Department of Sikorsky Aircraft.

4.     In my current position, I am responsible for training suppliers all over the country in the use of Sikorsky Aircraft Corporation's new Supplier Quality Software System. This software system supports/enables Sikorsky Aircraft's overall strategic decision to inspect product and parts manufactured by suppliers at the source of that manufacturing, namely the supplier's place of business. There are approximately 800 suppliers. I expect that at the current pace, we will complete the training by August 2005.

5.     At the time of the May 2001 layoff, I was Leader, Supplier Quality, and had full supervisory responsibility for all of Department 1530, which is the Receiving Inspection

Department. In this position, I played a significant role in the decision to reduce the headcount in Department 1530 in May 2001.

6.     Just prior to the May 2001 layoff, there were 25 employees in the Receiving Inspection Department (Department 1530). Prior to the May 2001 layoff, and historically, the Receiving Inspection Department was responsible for inspecting parts that were manufactured offsite by suppliers and transported to Sikorsky Aircraft where they would be inspected by Department 1530 Sikorsky Aircraft employees before being installed as a component part of the helicopter assembly process at Sikorsky Aircraft. The inspections were conducted on an audit basis. Those suppliers who have better quality records had their parts inspected on a less frequent audit schedule.

7.     In the Spring of 2001, prior to the layoff, several managers within the Product Integrity Department met on numerous occasions to determine the future course of how Sikorsky Aircraft would inspect supplier manufactured parts. The managers who met (and their titles at the time) were: Jim Miranti (Vice President, Product Integrity), James Nastri (Director, Product Integrity), John DePuma (Co-Captain, Product Integrity), and me. At these meetings, based upon our recommendation, Jim Miranti decided to make a fundamental change in the inspection process for supplier manufactured parts, concluding that the general practice of inspecting supplier parts at Sikorsky Aircraft was not the most economic and efficient manner of performing these inspections. Instead, it made much more sense to shift these inspections to the source of manufacturing. This fundamental change in the way Sikorsky Aircraft did business made sense because by conducting the inspections at the source of supply, Sikorsky Aircraft could resolve problems quickly and have the supplier inspectors resolve issues on the spot and enable point of use shipment of material. In contrast, under the then current practice of

2

conducting inspections at Sikorsky Aircraft, if there was a problem with a part, we would

frequently have delays in communicating with the supplier and would regularly have to return

the parts to the suppliers' place of business. It could take 60 days or more to get the material

corrected and returned. In determining to move the inspections to the source of supply, we

recognized that this could only take place over time. Attached hereto as Exhibit A is a true and

correct copy of a document entitled "Supplier Quality Process Improvement Plan," which I

created at some time during the period between December 2000 and March 2001 to summarize

our business decision and the rationale behind such decision.[1]  We further determined during

these meetings that moving inspections to the source would result in a substantial financial

savings to Sikorsky Aircraft in excess of $350,000 for one year. Attached hereto as Exhibit B

are true and correct copies of documents that were created at the direction of senior department

leadership and under my supervision at some time during the period between December 2000

and March 2001 which detail the savings and expenses associated with this change in business

plan, and summarize the total savings to Sikorsky Aircraft. Additionally, we decided that those

suppliers that only manufactured a few items for Sikorsky Aircraft would not be put on the list

for source inspections since it would not be economical since they only supplied a small quantity

of parts to Sikorsky Aircraft.

      8.     In light of this business decision to move the vast number of inspections to the

source of manufacturing, there would be a substantial reduction in the amount of work in

Department 1530. Attached hereto as Exhibit C is a true and correct copy of a document entitled

"Hourly Workforce Impact Analysis" which I created at some time during the period between

---

[1]    "Unitek," which is referenced in several of the exhibits to this Declaration, is the
company that Sikorsky Aircraft contracted with at that time to perform inspections outside of
Sikorsky Aircraft at the suppliers' place of business.

December 2000 and March 2001 to demonstrate how the change in business plan affected

Sikorsky Aircraft's inspection employees. Based on this business decision, it was determined by

senior department leadership that Department 1530 needed to immediately reduce its headcount

by nine employees as a result of the decrease in work load, with five of the employees being

from occupational group 50 and four of the employees being from occupational group 54. All of

the working leaders in Department 1530 were in occupational group 54. We decided that, going

forward, we would only need two Department 1530 working leaders, one for the first shift and

one for the second shift. Since there were five working leaders in Department 1530, that would

require the elimination of three of the five working leader positions. We further determined that

within occupational group 54 the position of Receiving Inspector Bulk Items would no longer be

required, as, given the overall reduction in workload, the inspection work performed by this

position could be absorbed by a more senior occupational group 50 inspector within Department

1530.

      9.     Accordingly, in May 2001, the Company laid off employees from Department

1530 (and other departments). The layoff was conducted according to the terms of the

Company's collective bargaining agreement ("CBA") in effect at the time. Pursuant to the terms

of the CBA and by operation of the seniority system, Mr. Baldyga was laid off from occupational

group 54. Mr. Baldyga could not bump down to a lower labor grade since all of the employees

junior to Mr. Baldyga in occupational group 54 (Shipping and Receiving Inspectors) were

protected from *any* layoff because they were designated, pursuant to Letter 18 of the CBA, as

having critical skills and, therefore, not subject to layoff regardless of their seniority. Attached

hereto as Exhibit D is a true and correct copy of Letter 18 from the CBA in effect at the time of

the May 2001 layoff. Therefore, there was no junior employee in Mr. Baldyga's occupational

4

group (occupational group 54) that he could displace. Attached hereto as Exhibit E is a true and correct copy of a chart which shows all employees in occupational groups 50 and 54 at Sikorsky Aircraft just prior to the May 2001 layoff. Occupational group 54 was a very small occupational group, consisting of only eleven employees before the layoff. As indicated on the chart, there were seven employees with less seniority than Mr. Baldyga in that occupational group. Three of them (Gomes, Lucas and Wojcicki) were laid off with Mr. Baldyga. The other four (McMillan, Hespelt, Garcia and Poleio) were junior to Mr. Baldyga but worked in different departments (1550 and 550) where their jobs were deemed "critically skilled," pursuant to Letter 18 of the CBA, giving them superseniority for layoff purposes over all other employees in their occupational group that were not designated as critically skilled.

10.     Mr. Baldyga's age played absolutely no part in his selection for layoff. At the time of the May 2001 layoff, I did not know Mr. Baldyga's age. At the meetings which I attended wherein the subject matter referenced in this Declaration was discussed, we never discussed the age of any employee and we never discussed age as being a factor in any of our decisions. As set out above, Mr. Baldyga was selected for layoff based solely upon seniority within his occupational group, pursuant to the express terms of the CBA. There was absolutely no other reason for his selection for layoff.

11.     As a result of the May 2001 layoff, we reduced the number of bargaining unit positions in Receiving Inspection (Department 1530) from 25 to 16. As we continue to make process improvements, we have continued to reduce the size of Department 1530. We currently have 12 bargaining unit employees in that department. By the time the training of outside suppliers is completed in 2005, it is planned that there will be approximately five employees in Department 1530.

I hereby declare under penalty of perjury that the above is true and correct.

Executed this 17th day of January, 2005, in Stratford, Connecticut.

Mark Lindsey